# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | | |
| v. | : | CRIMINAL NOS. | 04-278 |
| | | | 04-552 |
| JERMAINE DEMETRIUS ANDERSON | : | | |

## UNITED STATES' SENTENCING MEMORANDUM

### Introduction

The United States of America, by its attorneys, Patrick L. Meehan, United States Attorney for the Eastern District of Pennsylvania, and Albert S. Glenn and Linwood C. Wright, Jr., Assistant United States Attorneys for the district, hereby submits this sentencing memorandum for the assistance of the Court and to convey the government's sentencing recommendation.

On January 18, 2005, defendant Jermaine Demetrius Anderson pleaded guilty to Counts 1 and 2 of the superseding indictment in CR 04-278 (relating to counterfeit $20 bills) and to Count 1 of the indictment in CR 04-552 (identity theft). These counts in CR 04-278 charge Anderson with possessing counterfeit currency with intent to defraud (Count 1) and passing counterfeit currency with intent to defraud (Count 2). These arise from Anderson's possessing counterfeit currency at an IKEA store on September 25, 2003 and his passing counterfeit currency at a Strawbridges store on October 3, 2003. The count in CR 04-552 charges Anderson with identity theft in relation to his use of another person's identity in connection with an attempt to purchase automobiles. The Court has scheduled Anderson's sentencing for May 4, 2005 at

11:00 AM.

      I.      <u>Offense Conduct</u>

      A.      <u>CR 04-278</u>

        a.      <u>IKEA Offense – September 25, 2003 (Count 1)</u>

On September 25, 2003, Anderson switched two bundles of genuine $20 bills for two bundles of counterfeit $20 bills in a safe at the Plymouth Meeting IKEA store where he worked. Each bundle was 100 bills, or $2,000 in $20 bills. One of the bundles of counterfeit bills had one genuine bill on top, so that the total loss to IKEA was $3980.

        b.      <u>Cherry Hill Mall – October 3, 2003 (Count 2)</u>

On October 3, 2003, Anderson used $160 in counterfeit $20 bills to pay for merchandise at a Strawbridges store at the Cherry Hill Mall in Cherry Hill, New Jersey. The loss to Strawbridges was $160 dollars. The counterfeit $20 bills used at Strawbridges were similar to some of the counterfeit $20 bills which Anderson switched into the safe at IKEA.

      2.      <u>CR 04-552</u>

On September 11, 2001, Anderson used the identity of one Thomas Bagley to submit a credit application for the purchase of a Lincoln Navigator from Winner Lincoln-Mercury in Philadelphia. Based on this application using Bagley's identity information, Anderson took possession of a Lincoln Navigator.

Shortly after he obtained the Navigator, Anderson used the Internet to fill out a credit application with Pacifico Mazda and again used Bagley's identity information. After submitting this application, Anderson identified himself as Bagley and inquired about this credit application. An employee advised Anderson that the application had been declined, but when Anderson

reviewed the application he determined that the social security he used in Bagley's name had been incorrect by one digit. Anderson corrected this error, resubmitted the application in Bagley's name, and Pacifico Mazda approved the credit application. Prior to Anderson appearing to take possession of a Mazda automobile, the real Thomas Bagley contacted Pacifico Mazda and reported that he did not file an application. On September 27, 2001, when Anderson came in and signed a contract purchase agreement in Bagley's name, he sensed a problem and fled. In fleeing, Anderson's Navigator struck a Philadelphia police detective who was there to arrest Anderson.

The total attempted loss for CR 04-552 has been determined to be $80,185.

II. Presentence Report

A. Guideline Calculations

The Probation Officer in the PSR has determined that Anderson's final offense level is 14 and his criminal history category is III . The United States agrees with these calculations. This offense level yields a sentencing range of (14, III) = 21-27 months.

B. The PSR Correctly Used Two Groups for the Two Offenses

The probation officer determined that the offenses in the two indictments joined here for sentencing should be placed in separate groups for Anderson's Guidelines calculation. PSR ¶ 27. The probation officer noted that these offenses are crimes that are not of the same general type, and that two different guidelines apply. The probation officer in his revised report cited the Third Circuit's decision in United States v. Rudolph, 137 F.3d 173 (3d Cir. 1998) as a basis for his decision. The government agrees with this, and further notes that these crimes occurred at times separated by two years and were not connected in any way. The PSR concluded that

multiple count adjustments apply under section 3D1.4.

The probation officer correctly placed these two offenses in different groups. The two counterfeiting counts comprise one group, and the identity theft offense is a second group. Guideline 3D1.2 states that "All counts involving substantially the same harm shall be grouped together into a single Group." The guideline goes on to give several definitions of counts that involve "substantially the same harm." Among these definitions is §3D1.2(d), which states:

> When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or of the offense behavior os ongoing or continuous in nature and the offense guideline is written to cover such behavior.
>
> Offenses covered by the following guidelines are to be grouped under this subsection:
>       \*      \*      \*
> §§2B1.1, 2B1.4, 2B1.5, 2B4.1, 2B5.1, 2B5.3, 2B6.1
>       \*      \*      \*

U.S.C. G. § 3D1.2. The Third Circuit, however, has ruled that this guideline determines what combinations of offenses are eligible to be grouped, and that the district court must look to the facts of the offenses before deciding that the offenses should be grouped for purposes of guidelines calculations. Rudolph, 137 F.3d at 179.

Application Note 6 to this section states the following:

> Counts involving offenses to which different offense guidelines apply are grouped together under section (d) if the offenses are of the same general type and otherwise meet the criteria for grouping under this subsection. In such cases, the offense guideline that results in the highest offense level is used; see § 3D1.3(b). The "same general type" of offense is to be construed broadly.

Here, different guidelines apply to the two types of offenses. The counterfeiting offenses involved in CR 04-278 are analyzed under guideline §2B5.1. The identity theft offense of CR

04-522 are analyzed under guideline § 2B1.1. PSR ¶¶ 28, 35.

Listing of the applicable guidelines in section 3D1.2(d) does not mean that the offenses always have to group. The Second Circuit has found that the language of the "to be grouped" guideline is ambiguous. United States v. Lenoci, 377 F.3d 246, 254 (2d Cir. 2004). That court examined whether the guideline requires mandatory grouping for offenses listed in section 3D1.2(d) in the entire listing, in the same line, or in the same guideline. It noted that the language from Application Note 6 quoted above indicates that grouping is not automatic for offenses covered by different guidelines, even if on the same line in section 3D1.2(d) because it prescribes when such offenses will be grouped. The Lenoci court also noted that there is some basis for disagreement as to whether offenses under the same guideline should always be grouped, Lenoci, 377 F.3d at 255-256, although that will be infrequent. In Lenoci the court found that the district court's failure to group offenses of honest services mail fraud (§2C1.7) and bribery (§2C1.1) was, if error, harmless error, and the Lenoci court therefore did not resolve the defendant's grouping challenge.

In this case the probation officer's decision to place the counterfeiting offenses and the identity theft offenses in different groups makes a one-level difference in Anderson's offense level. Grouped separately, the identity theft offense is calculated at 16 (PSR ¶ 33) and the counterfeiting offense is set at 10 (PSR ¶ 40). Thus, under the units analysis of the grouping rules, the counterfeiting group causes a one level increase to the total offense level by adding that one level to the offense level of 16 from the identity theft group (PSR ¶ 45) yielding a final offense level (before acceptance of responsibility) of 17. PSR ¶ 46. If, on the other hand, the offenses were grouped together, the guidelines require that the highest guideline be used,

5

(U.S.S.G. §3D1.2 Application Note 6), and the final offense level would be 16.[1]

The Third Circuit has instructed that offenses should be grouped when grouping is consistent with the reason for the grouping provision. That grouping requirement is meant to ensure that the defendant does not receive "multiple punishment for substantially identical offense conduct," U.S.S.G. Ch. 3 Pt. D, intro, comment, and also to "limit the significance of the formal charging decision." Id.; Rudolph, 137 F.3d at 178. The Rudolph court noted that subsection (d) of the guideline is meant to "eliminate duplication created by what is, in essence, merely an aggregation of harm or a course of conduct that has already been taken into account by the setting of the offense level." Rudolph, 137 F.3d at 179.

The Third Circuit has stated that counts should not be grouped when those counts encompass different instances of illegal conduct and the different instances are not accounted for in their separate guidelines. In United States v. Griswold, 57 F.3d 291, 295 (3d Cir. 1995), the court affirmed the district court's refusal to group multiple firearms offenses where the defendant's "multiple counts encompassed numerous instances of illegal conduct" and the offense guideline did not cover multiple violations such that the defendant would be punished for the same conduct under different counts. Griswold, 57 F.3d at 296-97, cited by Rudolph, 137

---

[1] This assumes that the Court retains the enhancement in the identity theft guideline for reckless endangerment, as set out at PSR ¶ 32. If that is not included, the identity theft offense level would be 14, and the counterfeiting offense level would be within four levels of the identity theft group offense level. This would change the guidelines calculations further. The counterfeiting offense level would then count as one unit (see PSR ¶ 42), the total number of units would be 2 units (see PSR ¶ 43), and the increase in offense level would be 2 levels (see U.S.S.G. § 3D1.4). The final offense level would then be 16 (14 + 2). Thus, if grouped separately, the two level reduction for elimination of the reckless endangerment enhancement would result in a one-level reduction in the offense level. This would, of course, be further subject to the reduction for acceptance of responsibility, which would be three levels if the offense level is 16 or above, and two levels if it is 15 or below. U.S.S.G. § 3E1.1(b) (see PSR ¶ 47).

F.3d at 180. Griswald involved numerous instances of firearms violations over a two year period. Id. In United States v. Bush, 56 F.3d 536, 538 (3d Cir. 1995), the Third Circuit specifically advised that "courts must distinguish between occasions when increasing the punishment for an additional count would punish the defendant for conduct taken into account in another count, and those occasions when the added counts reflect additional criminal culpability." Bush involved multiple counts of firearms violations.

In Rudolph, under somewhat different facts from the present case, the court ruled that the defendant's counts should be separately grouped. There, the defendant, an INS special agent, had accepted bribes to provide templates for green cards, and had separately sold a copy of a federal presentence report. The bribe was covered by guideline 2C1.1, and the sale of the PSR was covered by guideline 2B1.1. The court found that the applicable guideline did not take into account the continuing nature of the conduct by the defendant. The court did note that it was not examining a case in which the guideline was determined on the basis of the amount of harm or loss, which makes it different from the present case. The court affirmed the district court's using two groups for those offenses.

Here, even though the guideline is determined by the amount of loss, the offenses are sufficiently different, distinct, and separate that using two separate groups appropriately recognizes their separate nature. Following the Rudolph court's instruction that the district court should look to whether the defendant is being punished for the same conduct in multiple counts, it is clear that separate groups are appropriate here. Anderson's identity theft violation from 2001 in his attempts to steal two automobiles are completely different crimes in kind and in time from the counterfeit offenses in 2003 which are charged in the second indictment. If the crimes

7

are grouped together, the small monetary loss for the counterfeit offenses will be subsumed into the attempted loss from the identity theft offense and there will be no incremental punishment for the counterfeit offenses. The difference in the kind of crimes is significant. The identity theft crimes involve the theft of automobiles by fraud. In contrast, the counterfeit offenses involve the corruption of the monetary system of the United States. These counterfeit-related crimes are only in federal court because of the federal concern with the integrity of United States currency. Thus, these two groups of counts do not involve "substantially the same harm," as required by the first sentence of section 3D1.2. As in Rudolph, the offenses are eligible for grouping under §3D1.2, but as that case indicates, the court must make the final determination based on the facts of the case and the specific guidelines used to determine the offense level. Here, the offenses are different in kind and time, and the only way they both will receive punishment is if they are separately grouped. The court should accept the probation officer's calculation using different groups.

The Sixth Circuit concluded that two offenses nearly identical to those here should be grouped separately. In United States v. Gordon, 1999 WL 16565 (6th Cir. Jan. 7, 1999) (unpublished), the court affirmed the district court's decision to create two groups for counterfeiting offenses and for identity theft offenses. There, the defendants had pleaded guilty to one count of conspiracy to manufacture, pass and/or sell counterfeit currency, travelers checks, and identification documents, in violation of 18 U.S.C. § 471, 472, 513(a) and 1028(a)(1). The probation office created two "pseudo counts" for these conspiracy objective offenses pursuant to Guidelines section 1B1.2(d). There was one "pseudo count" for the counterfeit currency offense, and one "pseudo count" for the other offenses, which included possession of counterfeit travelers

8

checks and counterfeit military identification cards and drivers' licenses. The defendants objected that all the conspiracy objectives should have been grouped together in one group, claiming that the offense levels were all based on the amount of harm or loss, citing Application Note 6, and noting that the application guidelines – 2B5.1 and 2F1.1[2] – are noted on the list of offenses which may be grouped togther. The Sixth Circuit noted that there is no automatic grouping, and looked to whether the offenses are of the same general type and otherwise meet the criteria for grouping. The court found it significant that different victims were involved in these offenses. The victim of the counterfeiting offense was the United States, and the victims of the check and ID charges was American Express and certain financial institutions. The court found that the offense were not of the "same type," were not closely related, and should not be grouped together. The Sixth Circuit affirmed the district court's decision not to group the offenses.

Similarly, the court here should not group the counterfeit offenses with the identity theft offense. The probation officer has accurately calculated Anderson's guidelines.

C. The Enhancement For Reckless Endangerment is Justified

The probation officer included a two-level enhancement for reckless endangerment during flight, pursuant to guideline 3C1.2, in the calculation for the identity offense. PSR ¶ 32. his enhancement is justified because of Anderson's flight following his confrontation at the Mazda dealership on September 27, 2001, in which he struck a Philadelphia police detective with his car during the flight.

Guideline section 3C1.2 applies when the defendant "recklessly creates a substantial

---

[2] Section 2F1.1 was deleted and consolidated with section 2B1.1 effective November 1, 2001.

9

risk of death or bodily injury to another person in the course of fleeing from a law enforcement officer." Here, Anderson created such a risk by his flight in the Lincoln Navigator and his actual battery on the Philadelphia detective. The fact of this assault is not in dispute, as Anderson pleaded guilty to it as a simple assault in Common Pleas court in Philadelphia. PSR ¶ 54. The PSR reports that according to the records, the police officer sustained minor injuries. This conduct falls squarely within the coverage of this guideline.

The inclusion of this guideline provision in the guideline calculations is permitted under the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005).[3] In Booker, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 125 S. Ct. at 757. This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to review by the Court of Appeals for "unreasonableness." Id. at 765.

In the wake of Booker, this Court must make a correct calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. As is plainly set forth in Booker, the Guidelines sentence is not to be based solely on facts found by a jury beyond a reasonable doubt. See United States v. Crosby,

---

[3] Anderson, in his sentencing memorandum, does not dispute that the conduct occurred or that it falls within this guideline, but rather objects on the basis that under the Supreme Court's decision in Blakely v. Washington, 124 S Ct 2531 (2004). As discussed in the text, the more recent decision in Booker makes clear that under the discretionary guidelines there is no requirement that the reckless endangerment enhancement be charged or found by a jury. The government notes that this is a guidelines enhancement and does not increase the statutory maximum sentence.

397 F.3d 103, 115 (2d Cir. 2005) ("a sentencing judge would * * * violate section 3553(a) by limiting consideration of the applicable Guidelines range to the facts found by the jury or admitted by the defendant, instead of considering the applicable Guidelines range, as required by subsection 3553(a)(4), based on the facts found by the court."); see also United States v. Mares, 2005 WL 503715, at *7 (5th Cir. Mar. 4, 2005) (Booker contemplates that, with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing. The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence."). Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 767; see also United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005) ("[t]he applicable Guidelines range is normally to be determined in the same manner as before Booker/Fanfan.").[4]

---

[4] The courts of appeals have generally stated that the proper sentencing procedure after Booker is for the district court first to calculate the Guidelines sentence and then to consider the other factors listed in 18 U.S.C. § 3553(a). See, e.g., Crosby, 397 F.3d at 111, 112 ("In order to fulfill this statutory duty to "consider" the Guidelines, a sentencing judge will normally have to determine the applicable Guidelines range. * * * . Once an applicable Guidelines range has been determined, the sentencing judge will have the duty, imposed by subsection 3553(a)(4), to 'consider' it, along with all of the factors listed in section 3553(a)."); United States v. Hughes, 396 F.3d 374, 378-79 (4th Cir. 2005) ("Consistent with the remedial scheme set forth in Booker, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence."). The government submits that the factors in Section 3553(a) have, to a large extent, been taken into account by the Sentencing Commission in its development of the Sentencing Guidelines, and that even a separate accounting of these factors should, in all but the most exceptional case, result in a sentence within the Guidelines range. Cf. Mares, 2005 WL 503715 at *7 (noting that if a sentencing judge exercises discretion to impose a sentence within the Guidelines range, the appellate court on review "will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines" and it will

Under this standard, the court should find that the facts here show that Anderson did flee from the police and in so doing did create a substantial risk of death or serious bodily injury to another person in the course of that flight. The Court should include the two-level enhancement found by the probation officer.

D. <u>Credit for Five Months Served</u>

Anderson claims that he should receive credit for the five months that he has served in custody for his guilty plea to simple assault. That simple assault arose out of Anderson's flight from his attempt to steal an automobile at the Mazda dealership on September 27, 2001.

The United States agrees that Anderson should receive credit for that five month sentence if the Court adopts the probation officer's inclusion of the two-level enhancement for reckless endangerment under Guideline §2C1.2. If Anderson receives a higher offense level because of flight, then the time he has served in connection with that flight should be credited under section 5G1.3(b). Because Anderson has completed his service of that sentence, the Court may credit it by reducing by five months the sentence it otherwise would impose in this case. If this five month adjustment would bring the sentence below the low end of the sentencing guideline range (which is 21-27 months as calculated by the probation office and advocated by the government here), then the Court may downward depart to give that 5-month credit.

If the Court disagrees with the probation officer and the government and deletes the two-level enhancement for reckless endangerment during flight, then the government urges that there should be no credit for that time served because the conduct pleaded to in state court would then not be taken into account by the guideline calculation in this case.

---

be "rare" for a reviewing court to say the sentence is unreasonable).

12

III. Recommendation

The government recommends that the Court sentence Anderson to a custody sentence within the calculated guideline range of 21-27 months (with 5 months credit if the reckless endangerment enhancement is included). The government further recommends a three year period of supervised release, a minimal fine of $1000, and a special assessment of $300.

The government understands that restitution is mandatory in this case. Restitution should be ordered to IKEA for $3980, and to Strawbridges for $160.

Conclusion

The Presentence Report correctly calculates the sentencing guidelines in this case. The government recommends that the Court sentence Anderson to a term of imprisonment within the guideline range, and that it order restitution as noted above.

Respectfully submitted,

PATRICK L. MEEHAN
United States Attorney

---

RICHARD GOLDBERG
Chief, Financial Fraud Unit
Assistant United States Attorney

---

ALBERT S. GLENN
Assistant United States Attorney

---

LINWOOD C. WRIGHT
Assistant United States Attorney

Dated: April 26, 2005

# CERTIFICATE OF SERVICE

I hereby certify that on this day I caused to be served a true and accurate copy of the foregoing **United States' Sentencing Memorandum** by first-class mail, postage prepaid, on:

David Koslow
Defender Association of Philadelphia
Federal Court Division
The Curtis Center Building
601 Walnut Street
Suite 540 West
Independence Square West
Philadelphia, PA 19106


Mark B. Hassinger
United States Probation Office
2400 William Green Federal Building
600 Arch Street
Philadelphia, PA 19106

                                                _____
                                                ALBERT S. GLENN
                                                Assistant United States Attorney

Dated: April 26, 2005